UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL A. LONG, | ) | CIV. 12-4060-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND REMANDING |
| | ) | DECISION OF COMMISSIONER |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Michael A. Long, moves for reversal of the Commissioner of Social

Security's decision denying his application for social security disability insurance

(SSDI) and attendant Medicare benefits under the Social Security Act. The

Commissioner opposes the motion. The court reverses and remands.

## PROCEDURAL HISTORY

On May 28, 2009, Long applied for SSDI and alleged an onset date of

December 22, 2007. AR 140, 141.[1] On August 25, 2009, the Social Security

Administration denied Long's application. AR 104. On October 23, 2009, Long

requested reconsideration, which was denied on January 11, 2010. AR 107, 108.

Long then requested a hearing before an Administrative Law Judge (ALJ). AR 111.

The ALJ held a hearing on November 23, 2010, after which the ALJ determined

that Long was not disabled and thus was not entitled to SSDI benefits. AR 25-33.

---

[1] All citations to "AR" refer to the appropriate page of the administrative
record.

On March 14, 2011, Long requested that the Appeals Council review the decision. AR 20. On February 18, 2012, the Appeals Council denied Long's request for review. AR 1. Long commenced this action on April 5, 2012, seeking judicial review of the Commissioner's determination that he is not disabled. Docket 1.

**FACTS**

Long was born on October 8, 1960. AR 136. At the time of the hearing before the ALJ, Long was 50 years old. Long went to the eleventh grade in school and later received his GED. AR 27.

Long has worked as a driver for a car dealership, a cement and dump truck driver for a construction company, a security guard, a bus driver, and a home living assistant. AR 197-201. He worked consistently from 1976 to 1989, and then he had no recorded earnings from 1990 to 1994. AR 152. Long again worked consistently from 1995 to 2002, and then his work became sporadic from 2003 to 2008. AR 152. His highest year's income was in 2002 when he made $17,303.92 working as a bus driver. AR 150. Long's two most recent jobs were working as a driver for a car dealership, making $184.20 in 2008 and $193.56 in 2007, and working as a security guard for the Bureau of Indian Affairs, making $282.20 in 2008 and $10,127.07 in 2005. AR 150-151. Long testified that he is no longer able to work as a bus driver because he is unable to pass the physical exam that is required. AR 65-66.

In an initial disability report, Long alleged problems caused by the removal of his kidney, by a hernia operation, and by his diabetes. AR 188. Additionally, Long alleges problems associated with a previous heart surgery, depression,

shoulder impairment, gallbladder disease, and his current medications. Docket 13 at 8.

## I.    Heart Problems

Long underwent an aortic valve replacement in January 2003 due to aortic insufficiency.[2] AR 299. An echocardiogram in 2004 showed an ejection fraction[3] of approximately 50 percent, severe diastolic dysfunction,[4] and trace aortic insufficiency. AR 299.

On May 11, 2007, Long was seen by a cardiologist, Dr. Lloyd Solberg. AR 299. At the time, Long denied any chest pain or dyspnea[5] on exertion, but was "fairly" inactive. AR 299. An echocardiogram was administered and revealed

---

[2] Aortic insufficiency, also known as aortic valve regurgitation, occurs when the aortic valve does not close properly and "some of the blood leaks back (regurgitates) through the aortic valve into the left ventricle." WebMD, http://www.webmd.com/heart-disease/tc/aortic-valve-regurgitation-overview (last visited June 12, 2013).

[3] "The ejection fraction is a measurement of the heart's efficiency and can be used to estimate the function of the left ventricle." WebMD, http://www.webmd.com/hw-popup/ejection-fraction (last visited June 12, 2013).

[4] Diastolic dysfunction "occurs when the heart muscle doesn't contract with enough force, so there is less oxygen-rich blood that is pumped throughout the body." WebMD, http://www.webmd.com/heart-disease/heart-failure/heart-failure-overview?page=2 (last visited June 12, 2013).

[5] "Dyspnea is defined as an uncomfortable awareness of breathing." WebMD, http://www.webmd.com/cancer/tc/ncicdr0000352186 -dyspnea-and-coughing-in-patients-with-advanced-cancer (last visited June 12, 2013).

"normally functioning prosthetic aortic valve with mild residual stenosis,[6]" "normal left ventricular systolic function with only a slight apical hypokinesis," and "normal right-sided pressures." AR 300-01.

Long had a check-up visit on April 23, 2008, with Dr. Solberg. Dr. Solberg noted that Long "has no complaint of angina and no symptoms of heart failure." AR 294. Dr. Solberg did note a "2/6 systolic flow murmur."[7] AR 293. The results of a December 10, 2008, echocardiogram showed a 55 percent ejection fraction, mild inferior wall hypokinesis, trace regurgitation, and a significantly stenotic prosthetic aortic valve, which is "suspicious for a mechanical valve." AR 610-11. The most recent echocardiogram, performed on November 17, 2010, revealed a moderately enlarged left atrium, an ejection fraction between 50 and 55 percent, moderate to severe aortic valve stenosis, and a prosthetic valve with significant residual stenosis. AR 936.

During the hearing before the ALJ, Long testified that he still "once in a while" gets slight chest pain, and that his doctor said his heart is a "little louder."[8] AR 70.

---

[6] Aortic stenosis is the narrowing of the aortic valve. WebMD, http://www.webmd.com/heart-disease/guide/heart-murmur-causes-treatments (last visited June 12, 2013).

[7] "A heart murmur is an extra sound . . . in the heartbeat caused by turbulent blood flow through the heart valves." WebMD, http://www.webmd.com/heart-disease/heart-murmur-symptoms (last visited June 12, 2013).

[8] Dr. Wingert, the doctor who performed Long's hernia surgery, speculated in his notes from February 5, 2009, that Long would need another aortic valve replacement at some point in the future. AR 707.

## II. Kidney Problems

Long began experiencing flank pain and blood in his urine in May 2007. AR 362. A CT scan found a mass on his lower left kidney "suspicious for a neoplastic lesion." AR 324. Surgery was recommended, and Long underwent an open left radical nephrectomy[9] on November 5, 2007. AR 317. The surgeon, Dr. Gillett, noted that Long "tolerated his procedure well," and the mass turned out to be benign. AR 557. Long was discharged seven days after his surgery. AR 557.

Long visited Dr. Gillett on November 15, 2007, to have the staples from his surgery removed. AR 553-52. Dr. Gillett noted that Long was experiencing some pain from the surgery but that it was improving each day. AR 553. There was evidence that an infection had occurred around one of the incision sites, and Long was given Rocephin[10] to counteract the infection. AR 553.

Dr. Gillett saw Long again on November 29, 2007, for a followup visit. AR 552. Dr. Gillet removed the remaining staples and noted that the infection was improving. AR 552. Dr. Gillet also recommended that Long increase his activity level. AR 552.

Long's next followup visit with Dr. Gillett was on December 13, 2007. AR 547. Dr. Gillett recorded that there existed two areas of persistent

---

[9] A nephrectomy is a surgery to remove a kidney. WebMD, http://www.webmd.com/urinary-incontinence-oab/picture-of-the-kidneys?page =2 (last visited June 12, 2013).

[10] Rocephin, or ceftriaxone, is an antibiotic used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs/drug-9768-Rocephin+IV.aspx?drugid=9768&drugname=Rocephin+IV&source=2 (last visited June 12, 2013).

serosanguineous[11] drainage, and he scheduled a CT scan for further examination. The CT scan showed evidence of infection, degenerative L5-S1 disc disease, and cholelithiasis.[12] Otherwise, Dr. Gillett stated that Long was "back to working part time and getting along fairly well." AR 547.

Dr. Gillett saw Long again on January 10, 2008. AR 546-47. At this time, Long was no longer on antibiotics, and he indicated that he was "pain free, but he continues to have some areas along his scar that are draining." AR 547. Dr. Gillett noted some granulation[13] that occurred around the incision site and treated it with silver nitrate. AR 546. Dr. Gillett asserted that the "infection has been treated adequately." AR 546.

Long's next followup visit with Dr. Gillett took place on January 24, 2008.[14] AR 546. Long indicated that the drainage had stopped and that he was shoveling snow and getting more active. AR 546. Dr. Gillett stated that the "healing process is going along well." AR 546.

During the ALJ hearing, Long testified that his kidney removal was causing him problems because the nerves and muscles were "slowly mending back but I

---

[11] Serosanguineous denotes an exudate or a discharge composed of or containing serum and also blood. Stedman's Medical Dictionary 1754 (28th ed. 2006).

[12] Cholelithiasis is the presence of concretions in the gall bladder or bile ducts. Stedman's Medical Dictionary 366 (28th ed. 2006).

[13] Granulation is the formation of minute, rounded, fleshy connective tissue projections on the surface of a wound. Stedman's Medical Dictionary 830 (28th ed. 2006).

[14] The January 24, 2008, visit with Dr. Gillett appears to be the last time Long saw Dr. Gillett.

got a mesh in there and it feels like wires[.]"[15] AR 68. He testified that the scar left from the surgery gives him "back problems" and that the mending of the nerves and muscles "affects [his] ability to move—as far as [his] walking, sitting, standing, lifting, it affects everything[.]" AR 68.

## III.     Hernia Problems

Long began feeling slight discomfort in his left flank area again in February 2008. Dr. Peterson, a physician with Indian Health Services (IHS) and who appears to be Long's primary physician, observed a noticeable bulge in the left flank area. AR 494. An April 8, 2008, visit with Dr. Peterson suggested that the pain may be coming from an "incisional hernia," and Long was referred to Dr. Wingert. AR 480.

Following examination, Dr. Wingert opined that the bulging was not a true hernia but instead an eventration[16] from denervation of the flank musculature. AR 711. Dr. Wingert recommended that Long wear a velcro binder to slow down the progression of the eventration and that surgery was unnecessary at that time. AR 711.

Long's followup visit with Dr. Wingert took place on October 30, 2008. AR 708. Dr. Wingert asserted that Long's diastasis[17] had tripled in size. This was making it hard for Long to bend, and Dr. Wingert opined that it would be

---

[15] The mesh was actually placed during the hernia repair, not during the nephrectomy.

[16] Eventration is the protrusion of omentum and/or intestine through a defect or weakness in the abdominal wall while the skin remains intact. Stedman's Medical Dictionary 678 (28th ed. 2006).

[17] Diastatis is any simple separation of normally joined parts. Stedman's Medical Dictionary 534 (28th ed. 2006).

"impossible for him to [get back to employment.]" AR 708. Dr. Wingert proposed a laparoscopic ventral hernia repair with a large piece of mesh to treat the bulging. AR 709.

Long underwent ventral hernia repair on May 20, 2009. AR 705. The discharge summary indicates that Long "did well postoperatively." AR 705. A followup visit with Dr. Wingert on June 4, 2009, resulted in Dr. Wingert being concerned about infection. AR 701. On June 11, 2009, Long was again seen by Dr. Wingert. AR 700. Long had "no obvious complaints or infection and no signs of fever, redness, swelling over the abdominal area." AR 700. An ultrasound showed fluid underneath the incision site. In response, Dr. Wingert extracted 50 cc's of red turbid fluid, but additional fluid remained. Thus, Dr. Wingert proposed placing a drain within Long so that the fluid could continuously drain. Long agreed and the surgery to place the drain occurred on June 18, 2009. AR 699.

A followup visit on June 25, 2009, showed that the permanent drain was not working as well as hoped. AR 696. But because Long had no signs of fever, redness, swelling, or tenderness over the area, Dr. Wingert opted to wait and see if the drain would start working. Long agreed. AR 697. This approach appears to have worked because notes from a July 23, 2009, visit with Dr. Wingert indicate that Long looked "very good" and the area was well healed. Also, Long was not having any significant pain, fevers, chills, or problems. AR 695. Dr. Wingert advised Long that he "could go to lifting 30 to 40 pounds. He can go to aerobic athletics if he wants to with no resistance training[.]" AR 695.

Some discomfort around the problem area persisted. Dr. Wingert saw Long again on October 1, 2009, and noticed a bulge in the area but no evidence of persistent hernia. AR 694. Dr. Wingert conveyed that Long will "always be limited with that eventration and the restriction from his mesh." AR 694.

Notes from an October 6, 2009, walk-in visit at IHS also suggest that Long was experiencing pain with movement. AR 718. It was explained to him that the pain was coming from the scar tissue and that it would take anywhere from six months to a year for the scar tissue to soften so that it would no longer hurt when it was stretched. AR 718.

On March 25, 2010, Long again met with Dr. Wingert because he was experiencing nausea and abdominal distress. AR 837. Dr. Wingert found gallstones and a ventral hernia, possibly two. Dr. Wingert proposed surgery, but Long declined because he wanted more time to think about it. AR 837. Medical notes from an April 13, 2010, visit with Bucher, CNP, suggest that Long intended to have surgery in May 2010 to repair the hernia and have his gallbladder removed. AR 825. Long had not had surgery by the time of the ALJ hearing, AR 67, and there is no indication in the administrative record that Long has since had surgery to deal with these issues.

Long testified during the ALJ hearing that he was still healing from the hernia repair. AR 67. Long testified that the mending of his nerves and muscles following the surgery was causing him difficulties. He stated that it is causing him back pains and also "feels like a bunch of needles there" when he tries to wear jeans. AR 76.

## IV.    Issues with Diabetes

Long has Type 2 diabetes.[18] AR 326, 809. The record demonstrates that Long's control over his diabetes fluctuates. For example, notes from a December 11, 2007, visit with Dr. Peterson show that Long's diabetes was under "reasonable control," AR 326, while notes from a February 23, 2010, visit with Bucher, CNP, show that Long has "poor control" over his diabetes. AR 810. Various medical professionals have continually instructed Long that he needs to improve his diet, take his medications regularly, and get regular exercise if he wants to get his diabetes under control. AR 810, 829, 831.

During his ALJ hearing, Long testified that his diabetes caused his vision to move and also caused him to get dizzy. AR 71. He also testified that he can get "a little weak" if his blood sugar dramatically drops. AR 74.

## V.    Shoulder Impairments

The medical records indicate sporadic episodes of shoulder pain. Notes from a January 12, 2007, visit with Bucher, CNP, show that Long reported "shoulder and knee pain intermittently." AR 384. There was no indication that anything was done at that time to relieve his pain. On March 5, 2007, Bucher, CNP, noted that Long "[m]oves all extremities without difficulty." AR 374. Long received a cortisone injection to help alleviate right shoulder pain in December 2008. AR 601. Notes from a September 21, 2010, visit with Bucher, CNP, also indicate pain in Long's

---

[18] Type 2 diabetes, once called non-insulin dependent diabetes, is the most common form of diabetes. People with Type 2 diabetes produce insulin, but either their pancreas does not produce enough insulin or the body cannot use the insulin adequately. WebMD, http://diabetes.webmd.com/guide/ type-2-diabetes (last visited June 12, 2013).

right shoulder, causing a decreased range of motion. AR 835. X-rays from September 21, 2010, suggest degenerative changes of the AC joint and a possible deformity of the humeral head.[19] AR 843. The record does not include any suggested treatment options following the September 21, 2010, x-ray of Long's shoulder.

At the ALJ hearing, Long testified that he has shoulder pain whenever surgeries are performed on him. He testified that the pain stems from injuries he had when he was younger. AR 74. He claimed his shoulder still hurt at the time of the hearing and such pain was affecting his sleep.

## VI.  Gallbladder Problems

Issues with Long's gallbladder appeared as early as May 23, 2007, when Dr. Helgeson noted the presence of cholelithiasis.[20] AR 630. The record, however, does not indicate that Long experienced debilitating problems with his gallbladder as late as February 24, 2010, when Dr. Paulson performed a CT scan that revealed "no obstructing stone seen at this time." AR 814. Dr. Wingert suggested in a March 25, 2010, appointment that a cholecystectomy[21] would be appropriate because he believed the gallstones were symptomatic. AR 837.

---

[19] The humeral head is the ball of the upper arm bone. WebMD, http://www.webmd.com/a-to-z-guides/rotator-cuff-disorders-cause (last visited June 12, 2013).

[20] Cholelithiasis is the presence of concentrations in the gallbladder. Stedman's Medical Dictionary 366 (28th ed. 2006).

[21] Cholecystectomy is the removal of the gallbladder. Stedman's Medical Dictionary 365 (28th ed. 2006).

The only testimony offered by Long during the ALJ hearing pertaining to his gallbladder was in reference to the recommendation by Dr. Wingert that Long have his gallbladder removed. AR 68. Long did not testify that his gallbladder was causing him any pain or limiting his ability to perform daily activities.

## VII. Depression

The record also includes evidence that Long is depressed. Alla Jones, a licensed professional counselor (LPC), wrote that Long had been a client with Flandreau Santee Sioux Tribe Behavioral Health for over three years as of March 18, 2010. AR 820. Starting in February of 2010, Long began meeting with a therapist on a weekly basis. Jones noted that Long met the criteria for Major Depressive Disorder, Single Episode. Jones believed that Long's depression was partially caused by his various surgeries and the stress that goes along with being unemployed. AR 820.

Long's testimony during the ALJ hearing regarding his depression is limited to this statement: "for a while I got kind of depression [sic] so I was seeing a counselor." AR 68.

## VIII. Medications

Long takes several medications because of his health issues. AR 1007. The noteworthy medications, according to Long, are "six antihypertensives and diuretics simultaneously, three hypoglycemics simultaneously, Coumadin and Simvastatin," all of which allegedly can cause fatigue. Docket 11 at 36. The most recent medications list on record includes the following: Acetaminophen/ Pentazocine (as needed for pain); Albuterol (as needed for shortness of breath);

Alcohol Isopropyl Pads;[22] Amlodipine;[23] Atenolol;[24] Citalopram;[25] Contour Blood

Glucose Strips;[26] Ezetimibe/Simvastatin;[27] Glucose tablet; Insulin Detemir;[28]

---

[22] These are simply for preparation prior to injections. Drugs.com, http://www.drugs.com/otc/118175/medichoice-antiseptic-isopropyl-alcohol-prep-pads.html (last visited June 12, 2013).

[23] Amlodipine relaxes and widens blood vessels to improve blood flow. It is used to treat high blood pressure or chest pain and other conditions caused by coronary artery disease. Drugs.com, http://www.drugs.com/search.php?searchterm=amlodipine (last visited June 12, 2013).

[24] Atenolol is a type of beta-blocker that is used to treat angina and hypertension. Drugs.com, http://www.drugs.com/search.php?searchterm=atenolol (last visited June 12, 2013).

[25] Citalopram is an antidepressant. Drugs.com, http://www.drugs.com/search.php?searchterm=citalopram (last visited June 12, 2013).

[26] These are used to test blood sugar levels.

[27] Ezetimibe and simvastatin reduce levels of "bad" cholesterol and triglycerides in the blood, while increasing levels of "good" cholesterol. Drugs.com, http://www.drugs.com/mtm/ezetimibe-and-simvastatin.html (last visited June 12, 2013).

[28] Insulin detemir is a long-acting form of insulin that works by lowering levels of glucose in the blood. Drugs.com, http://www.drugs.com/mtm/insulin-detemir.html (last visited June 12, 2013).

Lancet;[29] Lisinopril;[30] Multi-Vitamin; Potassium CL; Syringe, Insulin; Vitamin D (Cholecalciferol); and Warfarin.[31]

Long testified during the ALJ hearing that some of his medications make him drowsy, and he avoids taking those in the daytime. AR 73-74. Furthermore, Long testified that some of his diabetes pills can "dramatically" drop his blood sugar, causing him weakness. AR 74.

## ALJ DECISION

On January 18, 2011, the ALJ issued a decision denying Long's application for social security disability benefits. AR 25-33. The ALJ utilized the sequential five-step evaluation process.[32] At the first step, the ALJ determined that Long did not engage in substantial gainful activity during the period from his alleged onset date of December 22, 2007, through his date last insured of December 31, 2009.

_____

[29] A lancet is a type of surgical knife. Drugs.com, http://www.drugs.com/dict/lancet.html (last visited June 12, 2013).

[30] Lisinopril is an ACE inhibitor used to treat high blood pressure, congestive heart failure, and to improve survival after a heart attack. Drugs.com, http://www.drugs.com/search.php?searchterm=lisinopril (last visited June 12, 2013).

[31] Warfarin is an anticoagulant (blood thinner) that helps reduce the formation of blood clots. Drugs.com, http://www.drugs.com/warfarin.html (last visited June 12, 2013).

[32] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled: "(1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)); *see also* 20 C.F.R. § 416.920 (detailing the five-step process).

AR 27. At step two, the ALJ found that Long has the following severe impairments: "status-post aortic valve replacement; status-post left nephrotomy [sic];[33] status-post ventral hernia repair; and non-insulin dependent diabetes mellitus." AR 27. The ALJ also determined that Long's vision and depression are not severe impairments. AR 29. At step three, the ALJ found that Long does not have an impairment or a combination of impairments that meet or equal a listed impairment. AR 29-30. At step four, the ALJ concluded that Long has the RFC "to perform the full range of light work[.]" AR 30. Moreover, the ALJ determined that Long is "capable of performing past relevant work as a security guard." AR 32. At step five, the ALJ determined that Long could also perform other jobs that exist in significant numbers in the national economy. AR 33. Thus, the ALJ concluded that Long was not disabled.

## STANDARD OF REVIEW

An ALJ's decision must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as

---

[33] Long underwent a nephrectomy, which is total removal of a kidney. The ALJ's decision, although incorrectly labeling the procedure, notes that Long had a kidney removed.

substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

Long argues that the ALJ made seven reversible errors: (1) the ALJ failed to establish the proper onset date; (2) the ALJ failed to develop the record; (3) the ALJ failed to identify all "severe" impairments at step two; (4) the ALJ's credibility findings were not based on substantial evidence and correct legal standards; (5) the ALJ failed to consider all impairments in assessing Long's residual functional capacity (RFC); (6) the ALJ's finding that Long could perform work as a security guard was not supported by substantial evidence and did not comply with appropriate legal standards; and (7) the ALJ's alternative step 5 finding was not supported by substantial evidence and did not comply with appropriate legal standards.

## I.    Onset Date

Long argues that the ALJ failed to establish his date of onset of a disability in accordance with Social Security Ruling (SSR) 83-20, 1983 WL 31249. In determining the onset date, the "ALJ should consider the claimant's alleged date of onset, his work history, and the medical and other evidence of his condition." *Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006). "The date alleged by the individual should be used if it is consistent with all the evidence available." *Id.* (citing SSR 83-20).

The ALJ found an onset date of December 22, 2007. On his disability application as well as on a disability report, Long stated that he became unable to work because of his alleged disability on December 22, 2007. AR 140; 188. At his ALJ hearing, Long testified that he stopped working in December 2007. AR 66.

Long now asserts, however, that his onset date is May 4, 2007, and that the ALJ erred in accepting Long's initial alleged onset date. Long claims that the ALJ failed to consider the medical evidence of his condition as required under SSR 83-20. Although medical records indicate that Long was experiencing pain and had several hospital visits prior to December 22, 2007, such evidence does not persuade the court that the ALJ incorrectly determined Long's onset date, especially when the ALJ used the onset date that Long initially alleged. Long seems to argue that an ALJ should rely solely on the medical records while ignoring the claimant's alleged date and his work history when making the onset date determination. SSR 83-20 clearly states that the ALJ should consider all three types of evidence when determining the onset date. Here, the ALJ agreed with the claimant's alleged onset of December 22, 2007. This date corresponds with Long's testimony regarding when he believed he no longer was able to work. Furthermore, the majority of Long's medical issues that form the basis of his disability claim arose after December 2007. Thus, the ALJ did not err in using the date alleged by Long.

## II.     ALJ's Duty to Develop the Record

Long argues that the ALJ erred because he failed to develop the record. The ALJ "bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).

Long claims that the ALJ should have ordered a consultative evaluation to evaluate Long's alleged depression. "[T]he ALJ is required to order medical

examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011). The record here allowed the ALJ to make an informed decision pertaining to Long's alleged depression.

First, Long did not include depression as one of the conditions that limited his ability to work in his initial application. AR 166. Instead, Long indicated that his kidney problems, hernia problems, and diabetes were the conditions that caused him to be disabled. Not alleging depression on his original application is significant. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) ("The fact that she did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed."). Moreover, Long's relevant testimony at the ALJ hearing was limited to this statement: "for a while I got kind of depression [sic] so I was seeing a counselor." AR 68. Long did not testify that his depression was limiting his ability to work. The ALJ was not "obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

Even though the ALJ was not obliged to investigate Long's present claim of depression, the record shows that he did. Indeed, the ALJ found that Long's depression was a medically determinable impairment, but that it was "nonsevere" because it only imposed mild limitations in his activities of daily living. AR 29. Substantial evidence in the record supports this determination. As discussed above, Long did not claim that his depression was limiting him in either his

19

application for benefits or during his ALJ hearing. In support of his argument, Long relies heavily on a letter from Jones, LPC, in which she discusses Long's depression. But even in that letter Jones does not say that Long's depression limits his activity. AR 820. Instead, Jones concludes the letter by stating, "It would be difficult for [Long] to succeed at a job as his *physical health* would interfere with his every day functions." AR 820 (emphasis added). Overall, there is substantial evidence on the record that Long's depression did not result in significant limitations.

Long also claims that the ALJ should have obtained additional cardiology records. The record includes various cardiology reports that were made between May 11, 2007, and April 23, 2008. AR 293-304. The reports are lacking of any indication that Long's heart was imposing any limitations on him above and beyond what one would expect from an aortic valve replacement. As the ALJ pointed out, the record also includes the results of an echocardiogram performed by Long's cardiologist on December 10, 2008. AR 610-11. The ALJ noted that "there are no treatment records from the claimant's cardiologist." AR 28. The ALJ also referenced a report by Dr. Wingert, the surgeon who operated on Long's hernia, that suggested Long would need to have his aortic valve replaced, but again noted the lack of any report from Long's cardiologist corroborating Dr. Wingert's opinion. Long argues that the ALJ should have sought out additional cardiology reports from these time periods.

Reversal "due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir.

1995). Long has not persuaded the court that such unfairness or prejudice exists here. Long has not even hinted as to the substance of any "missing" reports and has not convinced the court that such reports would be dispositive of any issue here. Moreover, the fact that Long's representative did not obtain these reports prior to the hearing is of some relevance because it suggests they are unimportant. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

Additional evidence that Long was not prejudiced includes the fact that the ALJ found Long's heart problems to be severe impairments at step two. The ALJ found that Long's heart problems, although severe, were not limiting enough to conclude that Long was disabled. Whether this finding was based on substantial evidence is discussed in detail below.

In summary, the ALJ relied on the cardiology reports that were in the record in making his determination that Long's heart problems constitute a severe impairment but do not rise to the level of disabling. Long has not persuaded the court that any "missing" reports have prejudiced him. Thus, the court will not reverse the ALJ's determination due to failure to develop the record fairly and fully.

### III. Severe Impairments

Long argues that the ALJ erred when he failed to consider the combined effects of poorly controlled diabetes, severe diastolic dysfunction, chronic renal insufficiency, and multiple medications at step two. Long asserts that these conditions create severe fatigue. Long also claims that his shoulder injury and gallbladder problems constitute severe impairments.

At step two of the sequential evaluation process, Long must establish that he has a medically determinable physical or mental impairment that is severe. 20 C.F.R. § 416.920(a)(4)(ii); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [his] impairment or combination of impairments are severe.") (citation omitted). A severe impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 416.920(c), such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 416.921(b)(1)-(6). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b).

The ALJ determined that Long has four severe impairments: "status-post aortic valve replacement; status-post left nephrotomy [sic]; status-post ventral hernia repair; and non-insulin dependent diabetes mellitus." AR 27. The ALJ also determined that Long's depression and vision issues do not constitute severe impairments. The ALJ found that Long "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments[.]" AR 29. The ALJ also stated that he considered all of Long's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" AR 30. The ALJ specifically referenced Long's testimony regarding his impairments and

limitations.[34] AR 30. In sum, the ALJ's decision shows that he was aware of Long's alleged issues with fatigue and shoulder pain, but he concluded that they were not severe.[35]

After examining the record as a whole in relation to the ALJ's decision, the court finds that there is substantial evidence that supports the ALJ's step two determinations. *See McGee v. Astrue*, 291 Fed. App'x 783, 786 (8th Cir. 2008) ("We must affirm if the ALJ's decision is supported by substantial evidence in the record as a whole.") (citation omitted); *see also Kirby*, 500 F.3d at 707 ("It is the claimant's burden to establish that [his] impairment or combination of impairments are severe.").

## IV.    Credibility Findings

Long next argues that the ALJ erred by finding Long's testimony regarding the severity of his symptoms and limitations not credible. "[W]hen evaluating a claimant's credibility, in addition to considering the absence of objective medical evidence to support complaints of pain, an ALJ should consider a claimant's reported daily activities, the duration, frequency and intensity of his or her pain, precipitating and aggravating factors, medication, and functional restrictions."

---

[34] Long's testimony appears to be the only direct evidence on the record that supports his allegation that he suffers from "severe" fatigue.

[35] Furthermore, Long fails to meet his burden in showing why these impairments are severe. Instead, Long relies on a conclusory statement that such symptoms are severe along with citations to various internet web sites discussing how fatigue *may* be a symptom of Long's alleged health problems. The only citation to the actual record in support of Long's claim of "severe" fatigue is to testimony from the ALJ hearing—testimony the ALJ found not credible.

*Steed v. Astrue*, 524 F.3d 872, 875 n.4 (8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)). "The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [Long's] subjective complaints." *Id.* at 876 (internal quotation omitted).

The ALJ found that the medical record did not support the extent of Long's alleged limitations. In forming this conclusion, the ALJ relied most heavily on Dr. Wingert's opinion.[36] The record includes a Physical Residual Functional Capacity Assessment performed by Dr. Wingert on October 1, 2009. AR 732. Dr. Wingert opined the following: Long is capable of lifting fifty pounds occasionally and ten pounds frequently; Long can stand and/or walk about six hours in an eight-hour workday; Long can sit for a total of six hours in an eight-hour workday; Long is limited in his ability to push and/or pull with his upper extremities due to pain; he has no visual limitations; and he "would not tolerate vibration and physical stress of heavy equipment use." AR 733-36. The ALJ accepted Dr. Wingert's opinion because he was one of Long's treating physicians and his opinion was consistent with the medical record as a whole. AR 31.

The ALJ also noted a lack of evidence from other treating physicians when rejecting Long's subjective complaints. The most recent records from Long's cardiologist, Dr. Solberg, show that Long had no complaints of angina and no symptoms of heart failure. AR 294. Dr. Solberg did not suggest any treatment

---

[36] Dr. Wingert is the surgeon who repaired Long's hernia and continued to treat Long following the hernia repair.

other than to come in for a check up in one year, and he did not put any limitations on Long's activity. AR 293; 85 (Long testified to the ALJ that his "heart docs" have not limited his activities). The ALJ also noted that Long has not sought additional treatment from Dr. Gillett for his kidney since being released following his nephrectomy. AR 31. Lastly, the ALJ found it significant that no physician has limited Long's activities because of his diabetes. Indeed, the majority of the medical records relating to Long's diabetes have suggested increased activity, not limitations on activity. AR 460; 462; 464; 466; 480; 483; 494; 496; 724; 829. Thus, the ALJ concluded that Long's statements concerning the intensity, persistence, and limiting effects of his symptoms were inconsistent with the medical record and, thus, not credible.

The ALJ also noted that Long's daily activities do not support his claim that he is unable to work. The ALJ noted that Long goes grocery shopping, does the dishes at home, goes fishing, and goes out to eat.

Because the ALJ's conclusion that Long was not credible is supported by substantial evidence in the record, the court will not disrupt his decision. *See Steed*, 524 F.3d at 876 (noting that the ALJ is in the best position to making findings about a claimant's credibility and if substantial evidence supports his decision, it should not be reversed).

## V.     Residual Functional Capacity

The ALJ found that Long had the residual functional capacity to perform the full range of light work. AR 30. Long argues that the ALJ erred in making this determination because he failed to consider, among other things, Long's

absenteeism. Long asserts that had he been working between December 2007 and December 2009, he would have been absent from work 79 days due to medical visits and hospitalizations, 51 of which occurred between December 2007 and December 2008. He argues that such absenteeism at the very least should have been presented to the vocational expert during the ALJ hearing.

A claimant's RFC "is the most [he] can still do [in a work setting] despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis." 20 C.F.R. § 404.1545(b). "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). Although Long does not direct the court to a medical opinion that specifically addresses the issue of absenteeism, the record is full of notes from medical visits and hospitalizations that took place during the relevant time period pertaining to Long's disability claim. If Long was required to frequent hospitals and clinics 51 days in a one-year time period, certainly it would affect whether he was capable of working on a

regular and continuing basis.[37] Thus, the ALJ was required to at least consider Long's absenteeism when forming Long's RFC.

The ALJ's decision, however, shows no indication that he considered Long's absenteeism in forming Long's RFC. The ALJ never mentioned in his decision or during the hearing that Long's medical conditions resulted in numerous days of absence. And the ALJ did not include the issue of absenteeism when formulating the hypothetical for the vocational expert. Therefore, the court finds that the ALJ erred in determining Long's RFC because he failed to consider all of the limitations caused by his impairments, specifically his excessive absenteeism. *See Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998) ("Because this excessive absenteeism is caused by [the claimant's] impairment, [the claimant] is entitled to have it considered by the vocational expert.").

Because the court finds that the ALJ erred when he determined Long's RFC, analyzing the ALJ's step four and step five findings is unwarranted because the step four and step five findings depend on Long's RFC. Therefore, the ALJ should formulate Long's RFC taking into account the role absenteeism, along with his other impairments and limitations, may have played in Long's ability to work on a

---

[37] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). With that definition in mind, Long's argument that he was at least disabled between December 22, 2007, and December 22, 2008, because his impairments would have caused him to miss 51 (work) days in a 12-month period certainly has traction. It would be difficult for a person to find and maintain employment if he needs to take one day off per week.

regular and continuing basis. To ensure compliance at step four, the ALJ must define Long's RFC and also "make explicit findings regarding the actual physical and mental demands of the claimant's past work." *Pfitzner v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999).

## CONCLUSION

Following review of the record, the court finds that the ALJ erred in determining Long's RFC because the ALJ failed to consider all of Long's impairments and limitations. Accordingly, it is

ORDERED that the Commissioner's decision denying Long's claim for disability insurance benefits is reversed, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated June 12, 2013.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE